UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------x

EDWIN GODINEAUX,

                Plaintiff,

   -against-

LAGUARDIA AIRPORT MARRIOTT
HOTEL AND MARRIOTT
INTERNATIONAL INC.,

                Defendants.

-----------------------------------------------x

<u>MEMORANDUM AND ORDER</u>
05 - CV - 1782

GLASSER, United States Senior District Judge

## **INTRODUCTION**

        Edwin Godineaux ("Godineaux" or "Plaintiff"), formerly an employee of the LaGuardia Marriott Hotel, brings an action pursuant to N.Y.C. Admin. Code § 8-107 <u>et. seq.</u> (2005) and N.Y. Exec. Law §§ 290 <u>et. seq.</u>, 296 <u>et. seq.</u> (2006) ("NYCHRL" and "NYSHRL") against the LaGuardia Airport Marriott Hotel ("Marriott," "Hotel" or "Defendant") and Marriott Int'l, Inc.[1] for creating a hostile work environment that discriminated against him based on his gender, sexual orientation, marital status

---

[1]     By motion dated April 15, 2005, Defendant Marriott Int'l, Inc. moved to dismiss the complaint against Marriott Int'l, Inc. on the grounds that the applicable statute of limitations had run as against Marriott Int'l, Inc. and because Marriott Int'l, Inc. was not Plaintiff's employer. By letter to Magistrate Judge Pohorelsky dated July 19, 2005, Plaintiff indicated that he did not oppose such motion. Accordingly, the claims against Defendant Marriott Int'l, Inc. are hereby dismissed.

1

and race, and retaliating against him when he complained about the discrimination.

Before the Court is Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56. Defendant's motion is granted.

## FACTS

### I. Plaintiff's Employment at the LaGuardia Marriott Hotel

On August 11, 1994 Plaintiff began his employment at the LaGuardia Marriott Hotel as a Loss Prevention Officer ("LPO"), which was the position he maintained throughout his employment there.[2] At or about the time he commenced that employment, Plaintiff received training about Marriott's policies and procedures, including Marriott's Progressive Discipline Policy, which provides that employees may be disciplined, suspended, or terminated for stated reasons. On September 23, 1996, Plaintiff received an Associate Assessment form[3] completed by David Grant, a supervisor. Plaintiff received generally high scores, but some negative comments as well.

On January 20, 1997, Plaintiff received a written warning regarding his attendance. On May 7, 1997, he received a verbal warning regarding a work performance issue. On July 20, 1997, he received a verbal warning regarding lateness. On August 17, 1997, he received an Associate Assessment form that was completed by David Grant. Plaintiff received some high scores, but several low ones as well, in

---

[2] During his deposition, Plaintiff described his duties as an LPO as follows: "Detect and determ [sic], and we supposed [sic] to stand in the lobby, watch the luggage and all that stuff." He further testified that an LPO was different than a security officer, and when asked what "detect and determ" meant, Plaintiff responded by saying, "Watch, observe and you just detect and determ." (Godineaux Tr. 12).

[3] An Associate Assessment form appears to be an employee evaluation.

addition to some negative comments.

On December 10, 1997, Plaintiff received a verbal warning regarding his work performance. On January 21, 1998, he received a written warning regarding work performance issues. On June 3, 1998, he received a written warning regarding lateness. On June 30, 1998, he received a verbal warning regarding lateness. On August 14, 1998, he received a verbal warning regarding work performance. On October 8, 1998, he received an Associate Assessment form that was completed by David Grant. Plaintiff received high scores in most areas, but received some negative comments as well.

## II. Plaintiff's Misconduct Leading to his Termination

### A. February 26, 1999 Incident

On February 26, 1999, at approximately 2:30 a.m., Plaintiff was asked to escort two other Marriott employees (Allison Samborsky and Gamal Sidarows) to the parking lot. Plaintiff used a Marriott-owned vehicle and drove the wrong way down a one-way street to get to the parking lot. Both Samborsky and Sidarows submitted written statements confirming the incident. Samborsky, an Assistant Restaurant Manager at the Marriott, specifically expressed concern over the incident, stating, "My first concern is that [Plaintiff] did not seem to care that he was driving a company car and representing our hotel with his actions. He also did not take into consideration that he was jeopardizing two associates [sic] well beings. Third of all, he risked injuring any guest or fellow associate that may have been pulling out of the parking lot." (O'Neill aff. Ex. 8). She also indicated that when she asked Plaintiff what he was doing, Plaintiff responded, "I know all of the cops around here. I won't get a

ticket." (Id.).

Plaintiff, on the other hand, explained that the lobby where he was stationed was particularly busy at that time, and for the sake of expediency he drove the wrong way down the one-way street. He testified that there were no cars coming at the time. Plaintiff was suspended and was recommended for termination due to his "willful and serious misconduct." (56.1 ¶ 21; O'Neill aff. Ex. 7). Pursuant to Marriott's Guarantee of Fair Treatment Policy, Plaintiff had the choice of appealing this recommendation to a peer review panel, or the general manager of the hotel, Mr. Michael Johnston; he chose to appeal to Mr. Johnston. On his grievance form, Plaintiff wrote, "I do understand of the situation of what I did, and I am wrong about it, but I just wanted to hurry up back in the lobby cause of late check-ins, I did not wanted [sic] anything to happen to anyone in the lobby area, I was not thinking of what I was doing but I am very sorry for what I did, I just wanted to do my duties as a loss Prevention Officer . . . A situation like this will never happen again, I do mean so." (O'Neill aff. Ex. 7). Mr. Johnston decided to allow Plaintiff to return to work and he reduced the disciplinary notice to a written warning.

### B. August 25, 1999 Incident

On or about August 25, 1999, at about 12:30 a.m., a car was illegally parked in Marriott's driveway. Plaintiff was asked to have the car towed.[4] Instead of having the car towed, he suggested asking the guest who owned the car to move it, as he

---

[4] There is some discrepancy as to who told Plaintiff to move the car. Defendant contends that a manager told Plaintiff to move the car. Plaintiff testified that "Edgar" told him to move the car, and that Edgar was a doorman, not a manager.

felt that was the more appropriate procedure, and that that was what Marriott had done in the past in such situations. Eventually, Mr. Johnston was summoned, as was the owner of the car, who subsequently moved the vehicle. Due to this incident, Plaintiff received a verbal warning for insubordinate conduct toward a manager.

### C. August 30, 1999 Incident

On or about August 30, 1999, Plaintiff witnessed a Marriott front desk manager go into a hotel bathroom with a prostitute. There is a debate between the parties as to what happened next. Defendant contends that Plaintiff, in violation of his responsibilities as an LPO, discussed the incident with a number of other Marriott employees. Plaintiff testified that he told Mr. Johnston of the incident and that Mr. Johnston collected the security tape that had recorded the incident. Plaintiff testified that he told no one else of the incident. Therefore, he refused to sign the warning issued to him on September 3, 1999 "for failure to keep confidential information secure from anyone without a need to know." (O'Neill aff. Ex. 10; Godineaux Tr. 131).

### D. October 19, 1999 Incident

On or about October 19, 1999, Plaintiff took sixty dollars from the Hotel's "base bank" without permission or telling anyone that he had done so. The parties to this action strenuously debate the circumstances surrounding this incident. Plaintiff contends that it was standard practice for LPOs to borrow money from this bank as long as the individual taking the money informed the supervisor on call or informed the employee replacing him/her on the next shift and the money was returned within two or three days. Defendant, on the other hand, asserts that no such policy ever existed, and, in any event, Plaintiff did not tell a supervisor or any other employee at the

time that he took the money.  In fact, it was only after Ana Santos, another Marriott employee, called Plaintiff at home the next day to ask if he had taken the money that Plaintiff informed her that he had.  Further, Plaintiff's witness Fernando Rojas, a former employee of Marriott, testified that he did not recall a policy whereby LPOs could borrow money from the base bank and that he personally had never borrowed money from it.  Plaintiff gives conflicting reasons as to why he took the money.  On his appeal process form, he indicated that he took the money to buy medication for himself and his baby and food for his baby.  Additionally, he explained that Marriott owed him pay for over two years for some unspecified work he had done that apparently exceeded the scope of his regular employment.  On that appeal form, he made no mention of the purported policy upon which he claimed to rely.  However, during his deposition, he did testify that such borrowing was indeed the practice, and even named several individuals who he claimed to have availed themselves of that practice.

    The only evidence Plaintiff has produced in support of the existence of such a policy is a purported affidavit by Gonzalo Solarzano.  Defendant objects to this affidavit on a variety of grounds.  These objections need not be addressed, however, because Solarzano's statement fails in several respects.  First, the statement is not a sworn affidavit - it is merely signed and notarized.  Second, Solarzano writes with regard to the base bank, "I myself and others have borrowed money from that bank . . . As long as you put it back with-in 2 or 3 days prior to the borrowing the [sic] money."  While Plaintiff conveniently paraphrases Solarzano's statement as follows: "As long as you put it back within 2 or 3 days [after] borrowing the money," (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl. Mem.") at 20),

that is not in fact what the statement says. Solarzano's statement provides no support for Plaintiff's theory at all.

Plaintiff subsequently received a written warning and was suspended for serious misconduct. Pursuant to Marriott's Guarantee of Fair Treatment Policy, he chose to appeal this suspension to a peer review panel. The panel consisted of five members, two of whom were selected by Plaintiff from a list of Marriott employees trained to sit on peer review panels. On October 29, 1999, he presented his case to the panel, who determined that the appropriate action was to terminate him. Specifically, the panel found that "[c]ash handling is the property of the LaGuardia Marriott not for personal use. We as a panel deny [Plaintiff's] appeal due to the above reason." (O'Neill aff. Ex. 11). This statement was signed by five panelists.

### E. Marriott's Progressive Discipline Policy

Marriott's Progressive Discipline Policy ("the Policy") is a comprehensive policy outlining the procedures by which employees are disciplined, suspended, or terminated. The Policy provides, in relevant part, as follows:

> An associate can be terminated under progressive discipline if he/she has two written warnings and a third incident or situation occurs which is a violation of policy or rules or indicative of inappropriate behavior or poor judgement [sic] and which results in a third written warning. This third situation could also result in suspension, with recommendation for termination.

> An associate can also be discharged if he/she violates any of the following rules, which are such serious breaches of responsibility to the company that no prior warnings are required . . . Theft, attempted theft, or removal from the premises without proper authorization of company property or the property belonging to a customer or another associate.

(O'Neill aff. Ex. 2).

Furthermore, Marriott's policy provides for an internal appeals process whereby an employee can appeal a termination or recommendation for termination either to the general manager of the Hotel or to a peer review panel.

Defendant contends that pursuant to the Policy, Plaintiff was justifiably terminated on either one of two grounds, or both. First, Plaintiff had received three written warnings within a twelve month period. Second, Plaintiff had committed an immediately terminable offense.

### III. Sexual Harassment

### A. Plaintiff's Allegations of Sexual Harassment

Plaintiff alleges that he was subjected to sexual harassment by another Marriott employee, Darryl Lafferty ("Lafferty"), beginning in the late summer or early fall of 1998. Specifically, Plaintiff testified that Lafferty made hissing sounds at him, and that he did this approximately ten times. Plaintiff alleges that he was uncomfortable with these sounds, but did not complain to anyone at Marriott about them until either October or November of 1998. Plaintiff testified that the first time Lafferty hissed at him was in the summertime of 1998, when he was on duty in the parking lot, and Lafferty passed by, hissed at him, and said, "You know you want this butt." (Godineaux Tr. 35-37). Plaintiff testified that another time, he was in the cafeteria and asked Lafferty for stock tips, at which point Lafferty licked the cream cheese on his bagel "all up in [Plaintiff's] face." (Id. at 39). Additionally, Lafferty responded to Plaintiff's request for stock tips by saying, "well if you sleep with me then I'll tell you all about the stock." (Id. at 37). Plaintiff testified that at that point he told Pat Palmer ("Palmer"), a supervisor, about the incident and that she told him to "pay

[Lafferty] no mind." (Id. at 39). However, during Palmer's deposition, she testified that Plaintiff did not complain to her about Lafferty until an incident that occurred in December of 1998.

During his deposition, Plaintiff testified that on December 8, 1998, Palmer gave him a supervisor's schedule to bring to Michael Johnston's office. On his way, he walked by Lafferty's office. As he passed, Lafferty said hello to him. When Plaintiff came back to say hello in return, Lafferty began grabbing his own crotch. Claudia Patino, Lafferty's assistant, greeted Plaintiff with a kiss on the cheek. Lafferty then got up, grabbed Plaintiff and attempted to kiss him too. Plaintiff testified that Patino saw how angry he was getting, pulled him away from Lafferty, and brought him up to Palmer's office to report the incident. Plaintiff testified that Palmer laughed a little bit and told him to go to Kevin O'Neill ("O'Neill") in human resources to report the incident.

Plaintiff then did go to O'Neill to report the incident. O'Neill told him that Lafferty was proud of being gay. He told Plaintiff that there was a questionnaire regarding sexual harassment complaints, but that filling out the questionnaire was not a requirement of lodging a complaint. Plaintiff declined to fill out the questionnaire, and told O'Neill that he just wanted Lafferty's behavior to stop. O'Neill then confronted Lafferty about the incident, who claimed that he attempted to kiss Plaintiff in the same manner that Plaintiff had kissed Patino on the cheek because everyone was "holiday happy." O'Neill issued a verbal warning[5] to Lafferty which stated

---

[5]     Marriott issued "verbal warnings" in written form.

in part that "[Lafferty] has been made aware that his actions were unprofessional for the workplace. [Lafferty] understands that his behavior in the workplace must not lend themselves to misinterpretation. [Lafferty] has been re-issued the Marriott Policy regarding harrassment [sic] in the workplace. Further situations such as this may result in continued discipline action up to and including termination." (O'Neill aff. Ex. 14). Plaintiff testified he had no further contact with Lafferty thereafter.

### B.  Marriott's Sexual Harassment Policy

Marriott maintains a sexual harassment policy outlining what constitutes sexual harassment and the method and procedure for reporting harassment. The policy specifically states that "[Employees] are encouraged to use Marriott's Guarantee of Fair Treatment complaint procedure if they believe they have been sexually harassed. All harassment complaints will be investigated in a prompt and timely manner and corrective action will be taken where allegations are verified. No [employee] will suffer retaliation, intimidation, or any form of punishment for using the Guarantee of Fair Treatment or any other complaint procedure." (O'Neill aff. Ex. 6). The policy also provides that while a sexual harassment questionnaire can be provided, it is not necessary to complete the questionnaire in order for management to address an employee's concerns. Further, the policy sets forth a myriad of avenues whereby an employee can lodge a complaint. The policy encourages bringing an employee's concerns to his or her immediate manager or supervisor, but also states that "if the unwelcome behavior involves a manager or supervisor to whom you directly or indirectly report, you can also seek help from any other manager, your human resource representative, the Regional Vice President or Vice President of Human Resources, or

the Hotel Division Employee Relations department." (Id.).  Plaintiff testified that he had seen the policy, and that he complained to his supervisor who sent him to human resources.

### C.  Plaintiff's Allegations of Retaliation

Plaintiff alleges that Marriott retaliated against him by suspending him for three days without pay under the pretext of endangering personnel after he complained about Lafferty's harassment.  He alleges that although Marriott stated that he was disciplined for driving Marriott's car the wrong way down a one way street, this reason was pretextual and was in reality a retaliatory act because he complained about Lafferty.

Plaintiff further alleges that he was subject to additional scrutiny and was given poor performance reviews after complaining about Lafferty.  He alleges that after he filed a complaint with the Human Rights Commission on or about June 2, 1999, he continued to have his work scrutinized, putting him in fear of losing his job and subjecting him to stress-related illnesses.  He alleges that all of the disciplinary incidents enumerated above were in fact pretextual and that the only reason Marriott disciplined him on any of those occasions was retaliatory.

### DISCUSSION

### I.  Summary Judgment Standards

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ.

P. 56(c).  When deciding a motion for summary judgment, "[t]he court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor."  L.B. Foster Co. v. Am. Piles, Inc.,  138 F.3d 81, 87 (2d Cir. 1998) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation."  Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citations omitted).  The non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex Corp. v. Catrett,  477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)).  Summary judgment is inappropriate where there are "genuinely disputed material factual issues on which a factfinder might reasonably find for the party opposing summary judgment."  L.B. Foster Co., 138 F.3d at 87.

While the Second Circuit has "sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions," Holtz v. Rockefeller & Co., Inc.,  258 F.3d 62, 69 (2d Cir. 2001) (citing Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir.1994)), "'summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact.'"  Id. (quoting McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir.1997)).  The Second Circuit has further determined that "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of

discrimination cases." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001), cert. denied, 534 U.S. 993 (2001).

## II. Title VII Legal Standards[6]

### A. Hostile Work Environment[7]

NYCHRL and NYSHRL reflect their Title VII counterpart in prohibiting discrimination by an employer against his or her employees. See N.Y.C. Admin. Code § 8-107 et. seq. (2005) and N.Y. Exec. Law §§ 290 et. seq., 296 et. seq. (2006). The Second Circuit has determined that NYCHRL and NYSHRL claims are to be analyzed under the framework of a Title VII claim. See Petrosino v. Bell Atlantic, 385 F.3d 210, 220 n.11 (2d Cir. 2004) ("Our rulings as to the federal discrimination claims pertain equally to the state and local claims."). A plaintiff must establish two elements in order to prevail on a sexual harassment claim based on a hostile work environment: "'(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment, and (2) that a specific basis exists for imputing the conduct that created

---

[6]     Plaintiff did not bring a Title VII claim; Plaintiff brought claims under the NYSHRL and NYCHRL. However, both Plaintiff and Defendant address these claims pursuant to the Title VII standards. Indeed, Plaintiff, who fashioned the complaint as to exclude Title VII claims, in his opposition to Defendant's motion for summary judgment uses the heading "Sexual Harassment under Title VII" without mentioning the NYSHRL and NYCHRL. (Pl. Mem. at 4). Because the Second Circuit has indicated that federal standards of proof apply to discrimination claims under New York law, see Mandell v. County of Suffolk, 316 F.3d 368, 377 (2d Cir. 2003), and the parties so address the issues, this Court will use the standards governing Title VII in determining this motion.

[7]     In his complaint, Plaintiff did not enumerate his causes of action. A careful review of the complaint, however, indicates that Plaintiff is alleging: (1) a hostile work environment that discriminated against men, heterosexual men, married men and African Americans; and (2) retaliation. (Complaint ¶¶ 46-71).

the hostile environment to the employer.'" <u>Petrosino</u>, 385 F.3d at 221 (quoting <u>Mack v. Otis Elevator Co.</u>, 326 F.3d 116, 122 (2d Cir. 2003), <u>cert</u>. <u>denied</u>, 540 U.S. 1016 (2003)).

The first element is comprised of both an objective and subjective component. First, a plaintiff must establish that "the misconduct [was] severe or pervasive enough to create an objectively hostile or abusive work environment." <u>Petrosino</u>, 385 F.3d at 221 (citation omitted). Second, "the victim must also subjectively perceive that environment to be abusive." <u>Id.</u> The Supreme Court has determined that an objectively hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993) (citation omitted). However, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview." <u>Id.</u> Factors to consider when determining whether offensive conduct was severe or pervasive enough to render the workplace hostile or abusive include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Id.</u> at 23. However, "Title VII does not establish a 'general civility code' for the American workplace." <u>Petrosino</u>, 385 F.3d at 223 (citation omitted). Thus, "[s]imple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." <u>Id.</u> (citations omitted). Further, "Title VII does not prohibit all verbal or physical harassment in the

14

workplace; it is directed only at 'discriminat [ion] ⋯ because of ⋯ sex.' . . . The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (citations omitted).[8]

Considering these factors, courts in this Circuit have determined that certain work environments were not hostile as a matter of law, despite the presence of behavior that may have been considered "offensive and inappropriate," DeSimone v. JP Morgan/Chase Bank, No. 02-7039, 2004 WL 2978011 (S.D.N.Y. Dec. 22, 2004) (asking plaintiff out repeatedly despite her rejections, frequently using the word "fuck" when speaking to her, leering and staring at her body during office encounters, referring to female co-workers as "eye-candy," stating that female co-worker kept her job only because she was dating a senior-level employee, stating that another co-worker had slept her way to the top, suggesting that a female employee needed sex, and stating that he wanted to swap his wife with another employee's girlfriend), "crude and vulgar," Lucas v. South Nassau Communities Hosp., 54 F.Supp.2d 141, 148 (E.D.N.Y. 1998) (asking what color the plaintiff's underwear was and using expletives in the workplace), or "grotesque" Polimeni v. American Airlines, Inc., No. 92-5702, 1996 WL 743351, at *1-2 (E.D.N.Y. Dec. 18, 1996) (coworker grabbed plaintiff's arm and said he needed to be "fucked and touched").

---

[8] However, sexual harassment by members of the same sex does fall under the purview of Title VII. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79-80 (1998).

As to the second element, imputing liability to his employer, in a situation "[w]here an employee is the victim of sexual harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers," Petrosino, 385 F.3d at 225, as here, "an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." Id. (citing Faragher v. City of Boca Raton, 524 U.S. 775, 789 (1998)); accord Fairbrother v. Morrison, 412 F.3d 39, 49 (2d Cir. 2005).

Here, the Court finds that Plaintiff has not alleged sufficient facts to defeat Defendant's motion for summary judgment on his hostile work environment claim. Plaintiff alleges that Lafferty hissed at him, told Plaintiff, "you know you want this butt," licked the cream cheese on his bagel suggestively in front of Plaintiff, told Plaintiff he'd give Plaintiff stock tips if Plaintiff would sleep with him, and attempted to kiss Plaintiff.[9] However, it is undisputed that Plaintiff did not work in the same department as Lafferty and did not see Lafferty on a daily basis. Lafferty was not in a supervisory position over Plaintiff. Plaintiff alleges that these few incidents occurred over a span of several months, from late summer/early fall of 1998 until December 1998. While Plaintiff may have been offended by this conduct, such conduct does not rise to a level that is "severe or pervasive enough to create an objectively hostile or abusive work environment." Harris, 510 U.S. at 21. At most, the conduct amounted to

---

[9]    While these allegations, apart from the attempted kiss, are disputed by Lafferty, for the purposes of the disposition of a summary judgment motion they are presumed to be true.

"[s]imple teasing, offhand comments, or isolated incidents of offensive conduct, [which do] not support a claim of discriminatory harassment."  Petrosino,  385 F.3d at 223.

Even if Plaintiff had provided factual support for a hostile work environment claim, he has not provided sufficient factual allegations in support of imputing liability to Defendant, his employer.  There is no dispute that Lafferty was not in a supervisory position over Plaintiff.  Indeed, Plaintiff and Lafferty were not employed in the same department.  Therefore, Defendants' vicarious liability "depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action."  Id. at 225 (citation omitted).  There is some dispute as to whether Plaintiff complained to Palmer, his supervisor, about any incident prior to the December 1998 attempted kiss.  Plaintiff testified that he complained to Palmer twice about Lafferty's behavior prior to the December 1998 attempted kiss, and that Palmer had told him to "pay [Lafferty] no mind,"[10] which advice Plaintiff said he took.  He also testified that although Lafferty's behavior began in the late summer/early fall of 1998, he did not complain to Palmer until October or November of 1998, only a month or two before disciplinary action was taken against Lafferty.  There is no dispute that when he complained to Palmer after Lafferty attempted to kiss him in December of 1998, Palmer immediately sent him to O'Neill of human resources, who investigated the matter pursuant to Marriott's written Sexual Harassment Policy, and issued a warning to Lafferty in addition to giving him a copy of the policy which O'Neill made Lafferty sign.  While Plaintiff alleges that O'Neill's

---

[10]        In her deposition, Palmer testified that Plaintiff had not complained to her about Lafferty prior to the December 1998 incident.  (Palmer Tr. 27).

response was insufficient for a variety of reasons, he testified that his only objective was to have Lafferty's behavior stopped.  He further testified that after he complained to O'Neill, Lafferty's behavior stopped and Plaintiff never again had occasion to complain to anyone about Lafferty.  O'Neill's actions were consistent with Marriott's Sexual Harassment Policy and effectively stopped the unwanted behavior.  As such, Marriott did indeed take appropriate remedial action and vicarious liability cannot be imputed to Marriott.

## B. Retaliation

The Supreme Court has established a burden-shifting analysis for discrimination claims.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Using the framework established in McDonnell Douglas, courts have established a similar burden-shifting analysis when analyzing retaliatory discharge claims.  First, a plaintiff must establish a prima facie case of retaliation by establishing: "(1) that [he] was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that [he] suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action."  Holtz,  258 F.3d at 79 (citations omitted).

If the plaintiff succeeds in establishing a prima facie case, the burden then shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the allegedly retaliatory act."  Id. at 81.  At that point, the burden shifts once again to the plaintiff, who must demonstrate that the employer's proffered reasons for the adverse employment action were in fact a pretext for discriminatory action.  See id.

Plaintiff alleges that Defendant terminated his employment because

he filed a complaint with the New York City Commission on Human Rights about Lafferty's behavior.[11] While Plaintiff may be able to establish the first three elements of a prima facie case, namely, that he was engaged in the protected activity of complaining about what he perceived to be NYSHRL and NYCHRL violations, that Marriott was aware of such a complaint, and that he suffered the adverse employment action of termination, he has alleged no factual allegations in support of a claim that his termination was in fact causally related to his complaint. Even assuming Plaintiff could meet this burden, Marriott has more than adequately produced evidence of a legitimate, non-discriminatory reason for Plaintiff's termination, which Plaintiff has not shown is merely pretextual.

Plaintiff was disciplined for four separate infractions. The only infraction for which he has advanced any evidence of pretext is the August 30, 1999 incident where he received a warning for failing to keep confidential information confidential in violation of his duties as an LPO by spreading information regarding a hotel manager and a prostitute. Plaintiff denied this allegation and submitted some evidence that no other employee had ever been disciplined for such an infraction. Such

---

[11]    In his complaint, Plaintiff also alleges that he was subjected to additional scrutiny after he filed his complaint with the New York City Commission on Human Rights. However, Plaintiff has put forth no factual allegations in support of this claim. Plaintiff's assertion that his initial suspension was retaliatory in nature ignores the fact that he not only violated company policy and endangered the lives of two Marriott employees, he violated the law as well. Plaintiff acknowledged understanding the severity of his conduct at that point, and was re-instated by Mr. Johnston who had the discretion to allow Plaintiff to continue his employment. Further, the record indicates that contrary to Plaintiff's assertions, he was in fact reprimanded on many occasions for lateness and absenteeism prior to any allegations of sexual harassment and did not always receive stellar reviews.

evidence could hardly give rise to a presumption of retaliatory intent. It is of more than passing significance to note that prior to the first incident with Lafferty by which Plaintiff felt offended, he had already received eight employment related warnings which belies any credible claim of retaliation.

The prior disciplinary incidents leading up to the final, terminable incident cumulatively provide more than a legitimate non-discriminatory reason and non-retaliatory basis for Plaintiff's termination. As such, Marriott has met its burden. Other than the conclusory allegation that Defendant's disciplinary actions against Plaintiff were pretextual, Plaintiff has put forth no factual evidence tending to show that Marriott's legitimate, non-discriminatory reasons were merely pretextual.

The Court has considered Plaintiff's additional claims and has found them to be without merit.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.  The Clerk of the Court is respectfully directed to close the case, Plaintiff to take nothing.

SO ORDERED.

Dated:      Brooklyn, New York
            November 6, 2006


_____/s/_____

I. Leo Glasser
United States Senior District Judge




Copies of the foregoing memorandum and order were electronically sent to:

Counsel for the Plaintiff

Barbara Matthews
P.O. Box 757
125 Jefferson Avenue
St. James, NY 11780
631-584-0163
Fax: 631-584-3443
Email: bmatthewsesq@aol.com


Counsel for the Defendants

Brian Scott Cousin
Greenberg Traurig LLP
200 Park Avenue
New York, NY 10166

212-801-9354
Fax: 212-805-9354
Email: cousinb@gtlaw.com

Eric B. Sigda
Greenberg Traurig LLP
200 Park Avenue
New York, NY 10166
(212) 801-9388
Fax: (212) 805-9388
Email: sigdae@gtlaw.com

Lauren Rachel Tanen
Greenberg, Traurig LLP
200 Park Avenue
New York, NY 10166
(212) 801-6856
Fax: (212) 805-9456
Email: tanenl@gtlaw.com